**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| HARVEST GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-20-435-D |
| | ) | |
| LOVE'S TRAVEL STOPS & COUNTRY STORES, INC. and MUSKET CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court are the parties' cross-motions for summary judgment filed pursuant to FED. R. CIV. P. 56: Plaintiff/Counterclaim Defendant Harvest Group, LLC's ("Harvest") Motion for Summary Judgment on Defendants' Counterclaim and Motion for Partial Summary Judgment on its Breach of Contract Claim as to Liability [Doc. No. 324]; and Defendants/Counterclaim Plaintiffs Love's Travel Stores & Country Stores, Inc. and Musket Corporation's ("Love's") Second Motion for Summary Judgment [Doc. No. 321].[1] Also before the Court is Love's Motion for Voluntary Dismissal of Counterclaim without Prejudice [Doc. No. 316].

The Motions are fully briefed and ready for disposition.[2]

---

[1] The Court refers to Defendants collectively as Love's given that Musket is affiliated with, and controlled by, Love's. *See Harvest Grp., LLC v. Love's Travel Stops & Country Stores, Inc.,* 90 F.4th 1271, 1273 n.1 (10th Cir. 2024).

[2] Harvest filed responses [Doc. Nos. 325, 340] in opposition to Love's Motion for Voluntary Dismissal of Counterclaim and Motion for Summary Judgment, and a reply brief

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

In 2018, Harvest and Love's entered into an agreement in which Harvest would identify and obtain economic development incentives for Love's on a project-by-project basis. Harvest would receive a negotiation fee upon proper presentation of an "Incentive Presentation Binder" to Love's.

Harvest began working on obtaining incentives for Love's for the proposed development of a renewable diesel project (the "RD Project"), in the City of Hastings in Adams County, Nebraska. In 2019 and early 2020, Love's became concerned about the potential property tax burden for the RD Project. Harvest engaged in a strategy to deal with reducing the real property tax burden, which involved meeting with the Adams County tax assessor. Following the meeting between Harvest and the tax assessor, a spreadsheet was prepared (the "Assessment"), classifying the RD Project's property as 81% personal property versus 19% real property. The change in property classifications from a prior property tax estimate resulted in significantly lower tax exposure for Love's, and Harvest sought, as part of its Negotiation Fee, compensation for its part in reducing the potential property tax burden for the RD Project.

On March 25, 2020, Harvest submitted an Incentive Presentation Binder to Love's, which included the value derived from the Assessment. Love's determined that Harvest

---

(Continued . . .) [Doc. No. 347] in support of its Motion. Love's filed a response in opposition [Doc. No. 339] to Plaintiff's Motion for Partial Summary Judgment and replies [Doc. Nos. 333, 346] in support of its Motion for Voluntary Dismissal of Counterclaim and Motion for Summary Judgment.

was not owed the negotiation fee, refused to pay Harvest, and Harvest filed its complaint in this Court.[3]

In 2021, the parties filed cross motions for summary judgment, and Love's prevailed. [Doc. No. 141]. The previously-assigned district judge determined that the tax assessor's Assessment could not be considered a benefit under the Agreement, and that "[u]nder the clear the terms of the Agreement" if the document Harvest presented to Love's "contained only those incentives/benefits that Love's chose to utilize, then that document was an [Incentive Presentation Binder] under the Agreement and payment was due." *Id.* at 5-7.

Harvest appealed and prevailed at the Tenth Circuit. The Tenth Circuit specifically rejected three of the Court's findings: "(1) that Harvest was not owed a fee based on the value of the property-tax Assessment, (2) that Harvest was not owed interest from the date it presented the Incentive Presentation Binder in the event the Assessment is determined not to be an incentive/benefit, and (3) that Harvest was not a prevailing party." *Harvest Grp., LLC,* 90 F.4th at 1286. The Tenth Circuit remanded the case back to this Court for further consideration.

In November 2025, the Court granted the parties' request for leave to file new summary judgment motions [Doc. No. 315]. The Court advised the parties that their "additional briefing should be mindful of—and stay within the parameters created by—the Tenth Circuit's opinion . . . ." *Id.* at 2.

---

[3] The Fourth Amended Complaint is the operative pleading. [Doc. No. 204].

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id.* All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.*

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see* FED. R. CIV. P. 56(c)(1)(A).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019). When the parties file cross motions for summary judgment, the Court is entitled to assume "'no evidence needs to be considered other than that filed by the parties.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148

(10th Cir. 2000) (citation omitted).

"Dismissal under Rule 41(a)(2) is within the sound discretion of the court." *Clark v. Tansy*, 13 F.3d 1407, 1411 (10th Cir. 1993); *see Brown v. Baeke*, 413 F.3d 1121, 1123 (10th Cir. 2005). A district court may allow a plaintiff to dismiss an action "on terms that the court considers proper." FED. R. CIV. P. 41(a)(2). "'The rule is designed primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions.'" *Brown,* 413 F.3d at 1123 (quoting *Phillips USA, Inc. v. Allflex USA, Inc.,* 77 F.3d 354, 357 (10th Cir. 1996)). "When considering a motion to dismiss without prejudice, the important aspect is whether the opposing party will suffer prejudice in the light of the valid interests of the parties." *Clark*, 13 F.3d at 1411 (internal quotation and citation omitted). Relevant factors "include: the opposing party's effort and expense in preparing for trial; excessive delay and lack of diligence on the part of the movant; insufficient explanation of the need for a dismissal; and the present stage of litigation." *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997)).

**UNDISPUTED MATERIAL FACTS**[4]

In September 2018, Love's and Harvest entered into the Agreement, in which Harvest agreed to provide economic development incentives services to Love's. The Agreement provides that "upon Love's receipt of the Incentives Presentation Binder from

---

[4] This statement includes material facts that are supported by the record and not opposed in the manner required by FED. R. CIV. P. 56(c)(1) and LCvR56.1(d). All facts properly presented by a party and not specifically controverted by an opponent are deemed admitted, pursuant to FED. R. CIV. P. 56(e)(2) and LCvR56.1(e).

Harvest" a "***Negotiation Fee*** of ten percent (10%) of the mutually agreed upon anticipated utilization of incentives/benefits approved for pursuit by Love's included in the Incentive Presentation Binder" "shall be due." [Doc. No. 321-2, at 3 (emphasis in original)].

The Agreement defines "incentives" as follows:

> Incentives come in the form of cash grants, land grants or preferential land use terms, payment for infrastructure improvements, utility rate reductions, property tax reductions or abatements, income tax reductions or exemptions, sales or use tax reductions or exemptions, tax-increment financing, tax credits, payment for job training or employee screening assistance, wage rebates, low-cost financing, forgivable loans, or other various federal, state and local incentives.

*Id*. at 1.

The Agreement further provides that "Love's shall have the sole authority and sole discretion to elect and approve all federal state and local inventive programs" and "may, in its sole discretion, reject any proposed incentive." *Id.* at 3. Additionally, under the Agreement, Love's "is under no obligation to close any incentive transaction or enter into any incentive program." *Id.*

In 2019, Love's retained Harvest to obtain incentives for the RD Project.[5] In February 2019, Harvest sent Love's an "anticipated utilization schedule" for the RD Project. [Doc. No. 321-2, at 57]. The schedule was drafted by Harvest based on the assumption that "90% of the investment would be deemed as 'real property' versus 'personal property' per directions from the project team." *Id.* Harvest asked Love's to have

---

5 The RD Project is occasionally referred to as "Project Pavestone" in the parties' communications. *See* [Doc. No. 321-2, at 57, 61].

their tax personnel review the assumptions made in the schedule regarding the breakdown of the real versus personal property classifications in the schedule. *Id.*

In May 2019, Love's asked Harvest for clarification on what parts of the RD Project qualified as personal versus real property. Harvest explained that "[t]angible personal property include[d] possessions" and that for property "[t]o be considered personal property[,] the possessions must be moveable and owned by [Love's]." [Doc. No. 321-2, at 93]. Harvest further explained that Love's maintenance inventory for the project would be classified "as personal property until installed[,] at which point they would likely become part of the real property in this application." *Id.* at 92.

At some point, Love's tax department determined that 94% of the RD Project's components would be classified as real property and 6% as personal property.[6] In August

---

[6] Love's disputes that its tax department calculated the RD Project's property as consisting of 94% real property and 6% personal property. On appeal, the Tenth Circuit stated that "Love's tax department determined that 94% of the building components would be classified as real property and 6% as personal property." *Harvest,* 90 F.4th at 1275.

The Tenth Circuit has declined to "address under what circumstances findings of fact become the law of the case." *United States v. Monsisvais*, 946 F.2d 114, 115 n.2 (10th Cir. 1991). And "the decision whether to apply law of the case doctrine remains a matter of judicial discretion." *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1242 (10th Cir. 2016). "[S]ome courts construe the law of the case doctrine as applying to both findings of fact and conclusions of law," and at "least one court within the Tenth Circuit has held that 'factual findings, like legal determinations can establish the law of the case.'" *Alpine Bank v. Hubbell*, No. 05-CV-00026-CMA-KLM, 2010 WL 1258002, at *9 (D. Colo. Mar. 24, 2010) (quoting *FDIC v. Schuchmann,* 224 F. Supp. 2d 1332, 1340 (D.N.M. 2002)). Love's admitted in its response to Harvest's first summary judgment motion that it "projected its investment in the RD Project would be about 94% real property and 6% personal property in 2018," but noted that when the estimates were provided, it "did not know where the RD project would be built[.]" [Doc. No. 117, at 8-9.] Love's has not advanced any new evidence that gives the Court a reason to depart from the Tenth Circuit's factual finding.

2019, Love's, after reviewing another revised utilization schedule prepared by Harvest, expressed concern that "the property tax numbers . . . look[ed] really high." [Doc. No. 321-2, at 116].

In September 2019, Wes Bowen, co-principal of Harvest, had a phone call with the Mayor of Hastings, in which he informed the Mayor "that Harvest was aware that the Adams County Tax Assessor had discretion . . . regarding the overall valuation and segregation of specific assets as real or personal property." [Doc. No. 86-2, at 5 (Wes Bowen Decl.)].[7] Bowen asked the Mayor to reach out to Jackie Russell, the Adams County tax assessor, to see if "she would be willing to meet with [Harvest] to determine if [they] could devalue the project and segregate assets deemed as real property by Love's to personal property . . . ." *Id*

On September 18, 2019, following a phone call between Bowen and Russell, Russell emailed Bowen and noted that it was "really hard [for her] to process the fact that [Love's] would not have a lot of personal property value in [the] project." [Doc. No. 321-2, at 152]. She explained that "without seeing blueprints or plans of some sort of the anticipated construction, it would be hard for [her] to project an estimate of value that may be most appropriate." *Id*. She provided Bowen with a copy of the Nebraska Administrative Code,

[7] On appeal, Love's challenged the inclusion of Bowen's declaration in the summary judgment record because Bowen's statements were "self-serving." *Harvest*, 90 F.4th at 1283. Here, Love's revives this argument and asks the Court to not consider the Bowen declaration as many of the statements contained therein are conclusory and self-serving. [Doc. No. 339, at 12-16]. The Tenth Circuit explicitly rejected Love's arguments regarding Bowen's declaration, finding that the declaration was legally competent to oppose summary judgment, regardless of any possible self-serving motivations by Bowen. *Harvest*, 90 F.4th at 1283.

administrative guidance on personal property assessment from the Nebraska Department of Revenue, and a personal property schedule for an ethanol plant in Adams County "to give [Bowen] an idea of what they report yearly." *Id.* at 153-78. Bowen could not recall sharing this information with Love's before his September 19, 2026 meeting with Russell. *Id.* at 38.

The next day, Harvest had a call with Love's to discuss it's "novel strategy of holding a pre-construction cost segregation conference with the assessor . . . to lower the estimated property tax valuation through . . . the segregation of assets into the personal property category from the real property category." [Doc. No. 86-2, at 6]. Harvest informed Love's that a meeting with Russell and "other county and city officials" was set for September 20, 2019, and Love's gave Harvest permission to proceed with the meeting. [Doc. No. 86-9, at 5, Crites Dec.].[8]

On September 20, 2019, representatives from Adams County, including Russell and the Mayor of Hastings attended the meeting along with Harvest's representatives, Bowen and Rudy Watkins. [Doc. No. 321-2, at 41]. Following the meeting, Russell prepared a letter addressed to Love's, in which she attached the Assessment of the construction items that were "discussed and developed based on [Love's] initial pro forma information along

---

[8] Love's also objects to Crite's declaration as conclusory and self-serving. The Tenth Circuit did not directly address Crites declaration on appeal, but cited it as part of the summary judgment record. *See Harvest,* 90 F.4th at 1276, 1278, 1282 (citing Crites Decl.). The Court sees no reason why it should treat Crites' declaration any different than Bowen's for the purposes of summary judgment. Again, "[w]hether a statement is self-serving may affect the weight given it by a jury; but whether the statement is to be believed is still a matter for the factfinder." *Harvest,* 90 F.4th at 1283.

with [her] determined classifications for the project descriptions." [Doc. 86-29, at 1]. Russell's Assessment classified the RD Project's property as 19% real property and 81% personal property. *Id.* at 3.

Harvest sent the Assessment prepared by Russell to Love's and noted that the "meeting with the Adams County Assessor in Hastings, NE today went extremely well." [Doc. No. 321-2, at 188]. Harvest continued by stating that: "We are down to $208mm on valuation and we are at 19% real property and 81% personal property. Needless to say, this is a huge victory." *Id.*

On September 22, 2019, Harvest sent Love's a revised anticipated utilization schedule, which incorporated the value of the property tax reductions in the Assessment. The revised utilization schedule estimated a total of $187,909,835.00 in incentive value. The previous utilization schedule before the Russell meeting estimated a total of $66,873,733.00 in incentive value.

In November 2019, Love's contacted Harvest to schedule a meeting to discuss the estimates for the RD Project's incentive utilization. In early 2020, tensions began to emerge between Harvest and Love's regarding the appropriate amount for Harvest's negotiation fee. Several proposed versions of the incentive utilization schedules for the RD Project were exchanged by the parties.

On February 12, 2020, Love's sent Harvest an email stating: "Assuming the project makes business sense and Love is able to move forward, the only adjustment we've made has to do with the realization of the benefit related to property taxes." [Doc. No. 324-12]. Love's told Harvest that it had conducted some additional research and did not believe the

benefit of the property tax reduction would start to be realized until 2023. Attached to Love's email was a fee schedule estimating the total project value of the savings from the incentives as approximately $73 million. [Doc No. 321-2, at 59].

On February 19, 2020, Harvest informed Love's that it was an agreement with Love's February 12, 2020 fee schedule, and sent an invoice for $7,732,300.00 for services related to the RD Project. Harvest asserted that Love's ultimate decision on proceeding with the project was immaterial to whether its negotiation fee was due. Harvest based its position on the following language in the Agreement:

> Fee amounts are not subject to adjustment based on Love's subsequent sale, abandonment, restructuring, change in business activity, or other contingencies that may have a positive or negative effect on the incentives/benefits.

[Doc. No. 322-2, at 61].

In response, Love's directed Harvest to send all future correspondences to Love's in-house counsel. On March 4, 2020, Harvest sent Love's in-house counsel the Incentive Presentation Binder for the RD Project, which calculated the value of the Assessment as $99,160,200.00. [Doc. No. 323-2, at 2, 9].

On May 11, 2020, Harvest filed its complaint against Love's. [Doc. No. 1]. In April 2021, Love's decided to move forward with the RD Project. [Doc. 321-2, at 55]. Love's paid Harvest $3,948,954.00 for the negotiation fee for undisputed incentives related to the RD Project. Love's explained that it was not paying for the incentives related to the property tax reduction as "Harvest did not negotiate or persuade the Adams County Tax Assessor to 'classify' the property as personal property." *Id.* at 32.

## DISCUSSION

### I. Love's Motion to Voluntarily Dismiss Declaratory Judgment Counterclaim

As a threshold matter, Love's seeks to dismiss its counterclaim for declaratory judgment without prejudice, pursuant to FED. R. CIV. P. 41(a)(2). Love's states that it wants to dismiss its counterclaim to simplify the litigation and "promote a more efficient resolution at trial." [Doc. No. 316, at 1]. Specifically, Love's "seeks to dismiss the first part of the Counterclaim," in which it sought a declaratory judgment finding that:

- Harvest was not owed a negotiation fee from Love's, Musket, and/or any of their affiliates under the terms of the Agreement with respect to the RD Project unless and until Harvest presented Love's with a proper Incentive Presentation Binder, containing only those incentives that Love's agreed to and chose to utilize;
- Harvest is not owed a negotiation fee under the Agreement for any incentive or benefit made available to Love's on a non-discretionary or non-negotiated basis;
- Benefits obtained under the Nebraska Advantage Act[9] are non-discretionary and available to Love's because of Nebraska statutes, not because of Harvest's negotiations;
- Harvest is not owed a negotiation fee for Nebraska Advantage Act Benefits and Love's is entitled to a refund of any payment previously made to Harvest for Nebraska Advantage Act Benefits;
- The Property Classification was the result of Russell's non-discretionary application of Nebraska law, not any negotiations with Harvest; and

9 Love's engaged Harvest to procure economic incentives under the Nebraska Advantage Act, "a comprehensive economic development incentives package that meets the needs of businesses expanding in or relocating to Nebraska." [Doc. No. 86, at 11 n.1].

- Harvest is not owed a negotiation fee for Russell's Property Classification.

*Id*. at 2-3; *see also* [Doc. No. 211, at 13-14].

Accordingly, the Court addresses Love's Motion to Voluntarily Dismiss Declaratory Judgment Counterclaim at the outset because Harvest seeks summary judgment on Love's counterclaim.

Love's categorizes the declarations it is seeking as follows: those that would defeat Harvest's breach of contract claim (the "Breach Declarations"); those that relate to whether Love's was owed a refund for incentives paid to Harvest in May 2021 (the "Refund Declarations"); and finally, a declaration that "Harvest is not owed a negotiation fee under the Agreement for any incentive or benefit made available to Love's on a non-discretionary or non-negotiated basis." [Doc. No. 316, at 2-3].

Harvest opposes Love's motion [Doc. No. 325] and requests that the Court either deny Love's motion outright or grant it in part and dismiss Love's counterclaim without prejudice, but impose the curative conditions of awarding Harvest its attorneys' fees incurred in defending against Love's counterclaim.

Harvest's Partial Motion for Summary Judgment on Love's Counterclaim [Doc. No. 324] was not filed when Love's moved to voluntarily dismiss its declaratory judgment counterclaim. However, Harvest had already filed a motion for leave to file a second summary judgment motion, in which it noted that it intended "to seek summary judgment on . . . Defendants' counterclaim for declaratory relief ***in full***." [Doc. No. 309, at 6 (emphasis in original)].

### A. Whether Harvest would be prejudiced by dismissal of Love's counterclaim without prejudice.

It is hard for the Court to see how granting Love's motion to voluntarily dismiss its counterclaim without prejudice would not prejudice Harvest given that Harvest's summary judgment motion directly implicates the declaratory relief Love's seeks. *Sw. Casino & Hotel Corp. v. Flyingman,* No. CIV-07-949-C, 2008 WL 4816516, at *2 (W.D. Okla. Oct. 27, 2008) ("This case has been pending for over a year, and Defendants have spent time and money . . . defending the claims brought by Plaintiff. Now that Defendants have fully briefed a motion for summary judgment, it seems clear to the Court that they would suffer legal prejudice should the Plaintiff's motion for dismissal without prejudice be granted."). Love's maintains that it did not delay seeking dismissal of its counterclaim, but Love's counterclaim was filed in December 2024. Love's did not move to voluntarily dismiss its counterclaim until a year later in December 2025 after Harvest indicated that it planned to move for summary judgment on Love's counterclaim. Thus, the timing of Love's motion suggests it was filed to avoid the possibility of an adverse ruling. *Sw. Casino & Hotel Corp.,* 2008 WL 4816516, at *2 ("Motions to voluntarily dismiss should not be granted when a party is simply attempting to avoid an adverse ruling on a dispositive motion.") (citing *Phillips USA, Inc.,* 77 F.3d at 358).

Upon careful consideration of the current procedural posture in this case, the Court finds that a dismissal of Love's declaratory judgment counterclaim without prejudice and without any conditions to refiling would result in legal prejudice to Harvest. However, a dismissal subject to curative conditions should be permitted. *Rodriguez v. Warren*

*Theatres, LLC,* No. CIV-16-150-D, 2017 WL 1366089, at *2 (W.D. Okla. Apr. 12, 2017) (imposing curative conditions where the plaintiffs' voluntary dismissal motion was filed "more than two years after they originally commenced [case] in state court" and after "most defendants had filed dispositive motions").

Rule 41 provides that upon refiling a previously dismissed action, the district court: "(1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied." *See* FED. R. CIV. P. 41(d). Additionally, the Court has inherent authority to impose conditions "designed to alleviate any prejudice a defendant might otherwise suffer upon refiling of an action." *See Am. Nat'l Bank & Trust Co. v. Bic Corp.*, 931 F.2d 1411, 1412 (10th Cir. 1991).

Love's contends Harvest did not incur substantial expenses or expend a significant amount of time in defending against its counterclaim. However, the Court finds that, at this stage of the litigation, Harvest's preparation and filing of its partial summary judgment motion was a significant expense that could have been avoided, in part, if Love's moved to voluntarily dismiss its counterclaim earlier. Therefore, the Court finds that some of Harvest's costs should be borne by Love's if it chooses to refile, specifically costs that are authorized to be taxed by the Clerk under 28 U.S.C. § 1920. Accordingly, the Court will authorize Harvest to file a bill of costs after the dismissal of Love's declaratory judgment counterclaim as provided by LCvR54.1 and will direct the Clerk to determine taxable costs in the usual manner. This taxation of costs will not be included in the judgment in this case, absent other, compelling circumstances, but payment will be required as a condition to refiling the declaratory judgment claims.

For these reasons, the Court finds that Love's should be permitted to dismiss its declaratory judgment counterclaim without prejudice to refiling but conditions upon any future filing will be imposed as set forth in this Order.

### B. Prevailing party status.

Additionally, Harvest seeks prevailing party status under FED. R. CIV. P. 54(d) in the event Love's Motion to Voluntarily Dismiss Counterclaim is granted. [Doc. No. 325, at 13-15]. Love's contends that Harvest is not the prevailing party even if its counterclaim is dismissed without prejudice as Harvest's breach of contract claim would remain unresolved. As explained below, summary judgment cannot be granted in either party's favor on Harvest's breach of contract claim. Therefore, the Court reserves ruling on the issue of prevailing party status until this case has been fully adjudicated.

## II. Harvest's Breach of Contract Claim.

Oklahoma law applies in this diversity jurisdiction-based action to determine the substantive rights of the parties. *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005) ("A federal court sitting in diversity must apply state law as propounded by the forum's highest court."). The Agreement specified that Oklahoma law would govern the contract and neither party disputes that Oklahoma law applies. [Doc. Nos. 324, at 25; 339, at 5].

### A. The Tenth Circuit's remand.

Love's argues that the Tenth Circuit's remand was a general remand rather than a specific remand, and that there is still an open question as to whether Harvest's meeting

with Russell resulted in an incentive or a benefit. However, Love's framing of the Tenth Circuit's decision ignores its plain language:

> [W]e reject Love's argument that the Assessment was not an "incentive/benefit" under the agreement and agree with Harvest that there are genuine disputes of material fact about **whether the Assessment was the product of Harvest's efforts**, we reverse the district court's grant of summary judgment to Love's on those issues.

*Harvest,* 90 F.4th at 1274 (emphasis added). Thus, the issue the Tenth Circuit remanded to this Court to resolve is not whether the Assessment could qualify as an incentive/benefit under the Agreement, but instead, whether the Assessment was the product of Harvest's efforts. *See id.* at 1282 ("Both parties to the Agreement clearly understood it to include the Assessment as an incentive/benefit.").

Nonetheless, Love's focuses much of its briefing on arguing that the Tenth Circuit erroneously assumed "that the Russell Letter was a tax assessment" and contends that the letter prepared by Russell did not constitute (1) an assessment, (2) a government offer, (3) a tax reduction, or (4) an advisory tax information. *Id.* at 20-23. This appears to be an attempt by Love's to circumvent the Tenth Circuit's ruling by narrowly focusing on the specific form the incentive took. But the Tenth Circuit's decision foreclosed these arguments. *See Arizona v. California*, 460 U.S. 605, 618 (1983) (noting that the law of the case "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *see also Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995) ("[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case

and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal.”).[10]

**B. A Jury Must Determine Whether the Assessment was the Fruit of Harvest’s Labor.**

Love’s argues the Assessment was not the result of Harvest’s efforts because (1) Harvest did not negotiate, influence, or persuade Russell’s classification of the property, and (2) that the meeting with Russell constituted an attempt by Harvest “to create the appearance it had accomplished some extra-statutory (i.e., billable) result.” [Doc. No. 321, at 27-30].

In response, Harvest argues it is undisputed that its meeting with Russell was a unique part of its novel strategy to pursue Hastings as the location for the RD Project, that it went line by line through the RD Project’s construction budget with Russell, and provided critical factual information throughout the meeting to justify why certain parts of the RD Project should be categorized as personal versus real property.

As to the September 20, 2019 meeting with Harvest, Russell testified that she remembered “the gentlemen giving [her] a description of the item” and that they would make “the determination for that item at that time” and then move “onto the next item” on the list. [Doc. No. 324-44]. Russell’s account of the meeting does not match Love’s

[10] A district court may deviate from an appellate court’s mandate “under exceptional circumstances, including (1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) if blatant error from the prior decision would result in serious injustice if uncorrected.” *United States v. Webb*, 98 F.3d 585, 587 (10th Cir. 1996). Love’s does not show that any of these exceptional circumstances are present here.

description of Russell's application of Nebraska tax law in the meeting as nothing but "a mechanical application" [Doc. No. 321, at 7], a characterization the Tenth Circuit rejected on appeal. S*ee Harvest,* 90 F.4th at 1284 ("In our view, Harvest provided sufficient evidence to create a dispute of material fact about whether assessor Russell's classification was influenced by Harvest's efforts, and thus whether Harvest was owed a fee for obtaining it. This evidence paints a picture of something other than the mechanical application of law to the facts that is suggested by Russell's declaration."). Russell agreed it would be accurate to describe the meeting as consisting of her and Harvest working together to "exclude as many costs as possible from the valuation and to segregate as many of the assets as possible from real property to personal property." [Doc. No. 340-62, at 75:7-19 (Russell Dep.)]. So, the Court does not find Russell's testimony to be dispositive of the issue presented as Love's suggests.

On the other hand, Love's has presented evidence that Harvest possessed some of the information used to create the Assessment prior to its meeting with Russell. Russell shared with Harvest's co-principal, Bowen, the property valuation of a facility in Hastings to compare with the RD Project, copies of the Nebraska administrative code, an administrative guide on personal property assessment from the Nebraska Department of Revenue, and informed Bowen that it was hard for her "to process the fact that [Love's] would not have a lot of personal property value in [the RD] project." [Doc. No. 321-2, at 152-178]. And Bowen testified that he could not recall sharing this information with Love's prior to the September 20, 2019 meeting or after the meeting when he reported back to Love's about the success of the meeting.

Thus, it is a question for the jury to resolve as to whether the Assessment was truly a product of Harvest's efforts or whether Harvest's meeting with Russell was as Love's suggests, a sham with a preordained outcome designed to create a product for which it could bill Love's.

**C. A Jury Must Determine Whether There Was Mutual Agreement Between the Parties on the Value of the Assessment**

Love's also contends that Harvest was never entitled to its negotiation fee for the incentive it disputes--the Assessment--because certain conditions precedent were not met before Harvest presented it with the Incentive Presentation Binder.

Love's outlines three conditions precedent that were required for Harvest's negotiation fee to be due: (1) Love's either accepts an incentive proposed by Harvest or rejects it; (2) "Love's and Harvest mutually agree upon the utilization (i.e., the value to Love's over time) of the incentive"; and (3) "Harvest compiles the accepted incentives, along with the mutually agreed upon present values of the incentives, into an Incentive Presentation Binder and presents it to Love's." [Doc. No. 321, at 32-33]. Love's argues that the second condition precedent was unmet, that is, mutual agreement as to the anticipated utilization of the disputed incentive (the Assessment) and maintains that summary judgment should be granted in its favor as a result.

The parties dispute whether there was mutual agreement as to the anticipated value of the Assessment in the February 12, 2020 fee schedule sent by Love's. Love's points to the parties past performance for determining the valuation of the undisputed incentives as support for its position that there was never mutual agreement on the value of the

Assessment. Love's notes that there was a back-and-forth exchange between the parties as to the value of the undisputed incentives before it tendered payment. But the parties' previous performance under the Agreement is not materially distinguishable from the back-and-forth emails exchanged between Love's and Harvest regarding Love's anticipated utilization of the Assessment. As the Court previously noted, "[t]he Agreement does not provide any guidance or obligation on when or how Love's is to identify what incentives/benefits it wishes to utilize." [Doc. No. 141, at 4]. And although Love's eventually paid Harvest the negotiation fee for the undisputed incentives, it has not identified when there was mutual agreement on the value of those incentives.

Additionally, the Agreement's mutual agreement requirement certainly cannot be interpreted as requiring Love's intent to move forward with the RD Project before Harvest could be entitled to its fee for the Assessment. Love's relies in part on its February 12, 2020 email to Harvest, where it stated that the parties would "need an opportunity to take a last look at [the] numbers if Love's decides to move forward with the RD facility." [Doc. No. 322-2, at 55]. Love's contends that this language was a reservation of its contractual rights to mutually agree upon the utilization value of the Assessment. But this appears to be another go at an argument that the Court has rejected:

> Defendants argue that payment was not due until they decided to move forward with the project. The Court finds no support in the language of the Agreement for that position. As noted, the obligation to pay is triggered when an [Incentive Presentation Binder] is properly presented. It is possible that Love's could "choose to utilize" certain incentives without also deciding to move forward with the project. Clearly, the benefit of the incentive would only be realized if the project moved forward, but that is not a requirement of the contract. In that event, payment would be due under the Agreement even if the project did not move forward.

[Doc. No. 141, at 5].[11]

Harvest, on the other hand, contends that mutual agreement is immaterial to whether it was entitled to the negotiation fee upon presentation of the Incentive Presentation Binder, and that the mutual agreement language in the Agreement only applies to determining the specific amount of its fee. The Agreement is clear that Harvest's negotiation fee will be ten percent of the mutually agreed upon anticipated utilization of incentives/benefits included in the Incentive Presentation Binder. This, by necessity, anticipates mutual agreement on the incentives at issue **before** Harvest compiled the Incentive Presentation Binder and presented it. Thus, the question that remains open is when and whether there was mutual agreement between the parties before the Incentive Presentation Binder was presented to Love's.

Overall, when and whether the parties mutually agreed on the Assessment's value is unclear from the summary judgment record as the Court previously noted:

> Plaintiff argues that Love's agreed to its fee via a series of emails exchanged between itself and Mr. Haines, Love's CFO. However, no reasonable juror could find those emails establish an agreement between Plaintiff and Love's for a payment of an additional $3,423,346. Rather, the emails reflect each party's position regarding any amount due under the Agreement.

[Doc. No. 141, at 8].

---

[11] The Tenth Circuit did not address this finding on appeal, and the Court sees no reason to disturb this prior finding based on the summary judgment record.

Therefore, whether the parties ever mutually agreed on the value of the Assessment is a question for the jury to resolve.[12]

**III. Harvest's Alternative Damages Model.**

Finally, Love's asks the Court to find in its favor that Harvest's "alternative damages" theory is not supported by the Agreement. [Doc. No. 321, at 37-38]. The Court agrees.

In its operative complaint, Harvest states that "the value of Project Pavestone—and thus, the value of the incentives Harvest procured" has increased substantially since its lawsuit was filed and that it "is entitled to reap the benefit of that increased valuation." [Doc. No. 205, at 8]. Harvest asserts that it only "has put forward an alternative damages theory" to protect itself from "[Love's] ever-more-absurd positions in this case—including their assertion there's never been . . . mutual agreement." [Doc. No. 340, at 37 n.7].

The Agreement provides that:

> Fee amounts are not subject to adjustment based on Love's subsequent sale, abandonment, restructuring, change in business activity, or other contingencies that may have a positive or negative fee on the incentives/benefits.

---

[12] Love's also argues that contractual interest for the negotiation fee did not begin to run until May 19, 2021, when it paid Harvest for the undisputed incentives related to the RD Project. The Court finds that Love's arguments are not supported by the plain language of the Agreement. The Agreement is explicit that Harvest's negotiation fee was "due upon Love's receipt of the Incentives Presentation Binder," and that "[a]ny portion of a fee or expense not paid to Harvest when due will bear interest from the due date until paid at the legal rate of 10% per annum." [Doc. No. 321-2, at 3, 5].

[Doc. No. 321-2, at 3]. As explained above, the specific timing of when the parties reached mutual agreement on the anticipated utilization value of the incentives contained in the Incentive Presentation Binder is a factual dispute the jury must resolve. In any event, the Court finds that the alternative damages model is foreclosed by the plain terms of the Agreement.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Love's Motion for Voluntary Dismissal of Counterclaim Without Prejudice [Doc. No. 316] is **GRANTED,** as set forth herein. Specifically, Love's declaratory judgment counterclaim is dismissed without prejudice to refiling, subject to the condition that taxable costs in connection with Love's declaratory judgment action shall be determined by the Clerk as provided by LCvR54.1, and payment of such costs shall be a condition to refiling a second action pursuant to FED. R. CIV. P. 41(d).

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. No. 324] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 321] is **GRANTED in part** and **DENIED in part** as set forth herein. Specifically, the Court finds that Harvest's alternative damages model is foreclosed by the Agreement.

**IT IS SO ORDERED** this 30th day of September, 2026.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE